IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RAYMOND ANGERSTIEN, as Father and<br>Administrator of the Estate of<br>RYAN ANGERSTIEN, Deceased,<br>℅ The Law Office of Paul J. Cristallo<br>4403 ST. CLAIR AVENUE<br>CLEVELAND, OH  44113 | )<br>)<br>)<br>)<br>)<br>) | CASE NO.: 5:20-cv01333 |
| Plaintiff | )<br>)<br>) | |
| -vs- | )<br>) | |
| | ) | JUDGE JOHN R. ADAMS |
| SPRINGFIELD TOWNSHIP<br>2459 CANFIELD ROAD<br>AKRON, OH  44312 | )<br>)<br>)<br>) | |
| -and- | )<br>) | |
| | ) | **PLAINTIFF'S FIRST** |
| OFFICER BILLIE LAURENTI<br>2459 CANFIELD ROAD<br>AKRON, OH  44312 | )<br>)<br>) | **AMENDED COMPLAINT**<br><br>**(JURY DEMAND ENDORSED** |
| | )<br>) | **HEREON)** |
| -and- | )<br>) | |
| SGT. BRIAN TROYER<br>2459 CANFIELD ROAD<br>AKRON, OH  44312 | )<br>)<br>)<br>) | |
| -and- | )<br>) | |

OFFICER STEPHEN BURKET⁣ )
2459 CANFIELD ROAD )
AKRON, OH  44312 )
)
    -and- )
)
POLICE CHIEF DAVID HOOVER )
2459 CANFIELD ROAD )
AKRON, OH  44312 )
)
    -and- )
)
SPRINGFIELD TOWNSHIP POLICE )
OFFICER JOHN DOE 1 )
2459 CANFIELD ROAD )
AKRON, OH  44312 )
)
    -and- )
)
SPRINGFIELD TOWNSHIP POLICE )
OFFICER JOHN  DOE 2 )
2459 CANFIELD ROAD )
AKRON, OH  44312 )
)
    -and- )
)
SPRINGFIELD TOWNSHIP POLICE )
OFFICER JOHN  DOE 3 )
2459 CANFIELD ROAD )
AKRON, OH  44312 )
)
)
    -and- )
)
SPRINGFIELD TOWNSHIP )
EMS AND/OR FIRE JOHN  DOE 4 )
2459 CANFIELD ROAD )
AKRON, OH  44312 )
)
    -and- )
)
SPRINGFIELD TOWNSHIP )
EMS AND/OR FIRE JOHN  DOE 5 )
2459 CANFIELD ROAD )
AKRON, OH  44312 )

2

```
                                              )
        -and-                                 )
                                              )
SUMMIT COUNTY                                 )
OHIO BUILDING, 8TH FLOOR                      )
175 SOUTH MAIN STREET                         )
AKRON, OH  44308                              )
                                              )
                                              )
        -and-                                 )
                                              )
DEPUTY CATHERINE PHILLIPS                     )
% SUMMIT COUNTY SHERIFF'S DEPT.               )
53 UNIVERSITY AVENUE                          )
AKRON, OH  44308                              )
                                              )
        -and-                                 )
                                              )
DEPUTY JOHN DOE 6                             )
% SUMMIT COUNTY SHERIFF'S DEPT.               )
53 UNIVERSITY AVENUE                          )
AKRON, OH  44308                              )
```

## INTRODUCTION

1. This civil rights action arises out of the tasing and restraint death of Ryan Christopher Angerstien, an unarmed 30 year old. Ryan was a loving son and grandson. At the time of his death he lived with his grandmother and uncle. On June 18, 2018, at approximately 12:56 a.m., Ryan was in the midst of a physical and mental health crisis. Ryan was objectively distraught, incoherent, confused and scared. Rather than utilizing de-escalation techniques and providing Ryan with medical care, which would have been proper and acceptable police procedure, Ryan was subjected to excessive physical force, mental anguish, and was denied medical care for his serious medical needs. Bodycam

footage of his arrest and death is excruciating.  The video shows Springfield Township Police improperly restraining Ryan, placing all of their weight on his upper torso/chest as Ryan screams out for help.  The footage illustrates how the Springfield Township Police ignore and ridicule Ryan as he cries and begs for help until, ultimately, Ryan stops crying and begging - he passes away before our eyes.  As a direct and proximate result of these and other acts and omissions, Ryan suffered emotional distress, severe physical pain and suffering, and death.  Plaintiff Raymond Angerstien, Ryan Angerstien's father and the Administrator of the Estate of Ryan Angerstien, seeks compensatory and punitive damages as well as reasonable attorneys' fees and the costs associated with this action pursuant to 42 U.S.C. § 1988.

## PARTIES AND JURISDICTION

2.     This action is brought pursuant to claims arising under the laws of the State of Ohio; 28 U.S.C.§§1331, 1343 (3) and (4), 42 U.S.C §1985, and the Fourth and Fourteenth Amendments to the United States Constitution.  This matter is also brought pursuant to 28 U.S.C. §§1983 and 1988 as it is also an action for compensatory damages, punitive damages, and attorney fees.  Venue is proper in this District pursuant to 28 U.S.C.A. §1391(b).

3.     Plaintiff Raymond Angerstien is, and was at all times relevant, a resident of the State of Ohio and Summit County.  Raymond Angerstien is the duly appointed Administrator of the Estate of Ryan Angerstien.

4.     Defendant Springfield Township is and was at all times relevant a political subdivision and unit of local government duly organized under the laws of the State of

Ohio.  Springfield Township is a political subdivision/entity and is a "person" subject to being sued pursuant to 42 U.S.C. §1983.

5.      Defendant Billie Laurenti is, and was at all times relevant, a law enforcement officer employed by Springfield Township, Ohio who was acting under color of law within the course and scope and in furtherance of her employment with Springfield Township and Chief David Hoover.  Defendant Laurenti is a "person" under 42 U.S.C. § 1983.  Defendant Laurenti is sued in her individual capacity.

6.      Defendant Sergeant Brian Troyer is, and was at all times relevant, a law enforcement officer employed by Springfield Township, Ohio who was acting under color of law within the course and scope and in furtherance of his employment with Springfield Township and Chief David Hoover.  Defendant Troyer is a "person" under 42 U.S.C. § 1983.  Defendant Troyer is sued in his individual and official capacities.

7.      Defendant Stephen Burket is, and was at all times relevant, a law enforcement officer employed by Springfield Township, Ohio who was acting under color of law within the course and scope and in furtherance of his employment with Springfield Township and Chief David Hoover.  Defendant Burket is a "person" under 42 U.S.C. § 1983.  Defendant Burket is sued in his individual capacity.

8.      Defendant Police Chief David Hoover was at all times relevant herein the Chief of Police for Springfield Township, Ohio, a political subdivision and unit of local government duly organized under the laws of the State of Ohio, with the ability to be subject to suit, residing in Summit County, Ohio.  Defendant Chief Hoover was responsible for the administration, operation, training, and supervision of law

enforcement officers and personnel of the Springfield Township Police Department and for the promulgation, enforcement and review of rules, regulations, policies, customs, and practices relevant thereto, acting under color of law.  Defendant Chief Hoover is a "person" under 42 U.S.C. § 1983.  Defendant Hoover is sued in his official and individual capacities.

9.      John Doe 1, who may or may not be Defendant Stephen Burket, was at all times relevant, a law enforcement officer employed by Springfield Township, Ohio who was acting under color of law within the course and scope and in furtherance of his employment with Springfield Township.  Defendant John Doe 1 is a white male, approximately late 50's in age and 5"9' and approximately 200 lbs..  Following the in-custody death of Ryan Angerstien, three Springfield Township Police were interviewed by the Ohio Attorney General's Bureau of Criminal Investigations (BCI).  Further identifying and/or describing Springfield Township Police Officer John Doe 1, this officer was interviewed by BCI Agents on June 28, 2018.  His interview is set forth in the attached dropbox link:

https://www.dropbox.com/s/smntwdh3v66xlqv/Redacted%20interview%20with%20Officer%201.WMA?dl=0
Note that Plaintiff does not endorse or subscribe to the statements made by Springfield Township Officer John Doe 1 (believed to be Springfield Township Officer Burket), and denies the veracity of some of his statements.

10.      Springfield Township Police Officer John Doe 2, who may or may not be Defendant Sgt. Brian Troyer was, at all times relevant, a law enforcement officer employed by Springfield Township, Ohio who was acting under color of law within the

course and scope and in furtherance of his employment with Springfield Township. Police Defendant John Doe 2 is a white male who was also present on June 18, 2018 during the arrest of Ryan Angerstien, which ended with Ryan Angerstien being placed on an EMS stretcher at 1813 Nichols Drive, Akron, Ohio 44312 and for which this Springfield Township Police John Doe 2 was present.  Following Ryan Angerstien's in-custody death, three Springfield Township Police were interviewed by the Ohio Attorney General's Bureau of Criminal Investigations (BCI).  John Doe 2 is believed to be the Springfield Township Police Officer who was interviewed by BCI Agents on June 28, 2018.  His interview is set forth in the attached dropbox link:

https://www.dropbox.com/s/pjpbisbjmzlcocj/Redacted%20interview%20of%20Officer%202.WMA?dl=0

At a minimum, however, John Doe 2 is the Springfield Township Officer whose bodycam footage is shown in "Body Cam 1-Edited Down - Blurred" from, at least, 0:00 through 2:10.  "Body Cam 1 - Edited Down - Blurred" is a montage of true and accurate Springfield Township bodycam footage stemming from this incident.  John Doe 2 is the Officer and/or individual whose right forearm appears in the foregoing video from approximately 0:00 to 2:10.

**WARNING:  THE BODYCAM VIDEO INCLUDES GRAPHIC AND DISTURBING FOOTAGE INCLUDING SUFFERING AND DEATH.**

11.
https://www.dropbox.com/s/n2eb6icpxyytz0y/Body%20Cam%201-Edited%20Down-blurred.mp4?dl=0

12.    Further describing and/or identifying John Doe 2, in addition to being present at the aforementioned time and place, and in addition to providing his

bodycamera footage which includes his voice and the fact that he is wearing a watch on his right wrist, Defendant John Doe 2's exact name and identity is known and/or readily knowable to the Defendant John Doe 2 and Springfield Township as his presence, role, audio and video evidence, and other identifying information is within the possession and control of Springfield Township. Defendant John Doe 2 is a "person" under 42 U.S.C. § 1983. This Defendant is sued in his individual capacity.

13.     Springfield Township Police Officer John Doe 3, who may or may not be Defendant Billie Laurenti, was at all times relevant, a law enforcement officer employed by Springfield Township, Ohio who was acting under color of law within the course and scope and in furtherance of her employment with Springfield Township. Defendant John Doe 3 is a white female, approximately 46 years old and approximately 5"3' and weighs approximately 145 lbs. Following Ryan Angerstien's in-custody death, three Springfield Township Police were interviewed by the Ohio Attorney General's Bureau of Criminal Investigations (BCI). John Doe 3 is the Springfield Township Police Officer who was interviewed by BCI Agents on June 28, 2018. Her interview is set forth in the attached dropbox link:

https://www.dropbox.com/s/47qn2u44p2yup27/Redacted%20interview%20of%20Officer%203.WMA?dl=0

14.     Further identifying and/or describing Springfield Township Police Officer John Doe 3, (again, believed to be Springfield Township Officer Laurenti) her bodycam footage of this event is captured and can be viewed at the dropbox link in the paragraph below.

15.

https://www.dropbox.com/sh/hb1617t3splb6el/AAAAqLeIUKyBPFD0FbhRgnPSa?dl=0

16.     Springfield Township Defendant John Doe 3's exact name and identity is known and/or readily knowable to Defendant John Doe 3 and Springfield Township as her presence, role, audio and video evidence, and other identifying information is within the exclusive possession and control of Springfield Township.  Defendant John Doe 3 is a "person" under 42 U.S.C. § 1983.  This Defendant is sued in her individual capacity.

17.     Springfield Township John Doe 4 is and was at all times relevant, a law enforcement and/or fire department officer and/or EMS officer employed or under the direction and control of Springfield Township, Ohio who was acting under color of law within the course and scope and in furtherance of his employment or duties with Springfield Township.  Defendant John Doe 4 is a white male, 40's, 6.0' - 6.1', 40's,  he may have a light beard or goatee and is the Springfield Township officer who can be seen walking into the scene at 2:15 to 2:24 of "Body Cam 1-Edited Down - Blurred", the link to which is attached hereto at para. 11.  Further describing and/or identifying Springfield Township Officer John Doe 4, John Doe 4, he is wearing a blue shirt with the print "Springfield Fire" on the back, he is also wearing a ball cap and white gloves.  Further describing and/or identifying, John Doe 4 can be seen walking on to the scene from the left and him almost immediately bends down and puts his left hand/fingers on Ryan Angerstien's neck in an apparent attempt to check for a pulse as seen at 2:16-2:23 on "Body Cam 1-Edited Down".  At the time she makes this statement, John Doe 4 is

standing to the right of a man wearing a shirt that has "SPRINGFIELD FIRE" on the back of his shirt, is wearing a ballcap, and is bending over to check Ryan Angerstien's pulse. Defendant John Doe 4's exact name and identity is known and/or readily knowable to the Defendant John Doe 4 and Springfield Township as her presence, role, audio and video evidence, and other identifying information is within the possession and control of Springfield Township. Defendant John Doe 4 is a "person" under 42 U.S.C. § 1983. This Defendant is sued in his individual capacity.

18.     Springfield Township John Doe 5 is and was at all times relevant, a law enforcement officer or fire department officer or EMS officer employed or under the direction and control of Springfield Township, Ohio who was acting under color of law within the course and scope and in furtherance of his employment and/or duties with Springfield Township. Defendant John Doe 5 is a white male, 40's to 50's, 5'9" - 5'11", he is bald and has a small, light patch of facial hair on his chin, and is the Springfield Township officer who can be seen bringing in a gurney from the left of the screen at 2:23 "Body Cam 1-Edited Down - Blurred", the link to which is attached hereto at para. 11. Further describing and/or identifying Springfield Township Officer John Doe 5, John Doe 5, he is wearing a blue shirt with what appears to be a "Springfield Township" insignia/patch on the right shoulder. Further describing and/or identifying, John Doe 5 can be seen helping to lift Ryan Angerstien , onto the gurney wearing his blue shirt with his back to the camera at 2:33. He also has a radio in his back left pocket, is wearing white gloves, and can clearly be identified at 2:37 - 2:38, and 2:51-2:53 of "Body Cam 1-Edited Down - Blurred". Defendant John Doe 5's exact name and identity is known

and/or readily knowable to Defendant John Doe 5 and Springfield Township as his presence, role, audio and video evidence, and other identifying information is within the possession and control of Springfield Township. Defendant John  Doe 5 is a "person" under 42 U.S.C. § 1983.  This Defendant is sued in his individual capacity.

19.     Defendant Deputy Catherine Phillips is and was at all times relevant, a law enforcement officer for the Summit County Sheriff's Department employed and acting under the direction and control of Summit County, Ohio.  Deputy Phillips was acting under color of law within the course and scope and in furtherance of her employment and/or duties with Summit County.  Defendant Phillips is a "person" under 42 U.S.C. § 1983.  Defendant Phillips is sued in her individual capacity.

20.     Defendant Summit County Deputy John Doe 6 is a white male, and is the Summit County Deputy who can be seen on "Body Cam 1-Edited Down - Blurred", the dropbox link to which video is included herein at para. 11.  Plaintiff submits this bodycam video from the night of Ryan Phillips' death includes footage of a while male wearing a wrist watch on his right arm.  Upon information and belief, this individual works in law enforcement and took an active and critical part in Ryan Angerstien's arrest and death.  Plaintiff believes this John Doe Officer may be a Summit County Sheriff's Deputy.  At a minimum, however, John Doe 6 is the Summit County Sheriff's Deputy whose bodycam footage is shown in "Body Cam 1-Edited Down - Blurred" from, at least, 0:00 through 2:10.  "Body Cam 1 - Edited Down - Blurred" is a montage of true and accurate bodycam footage stemming from this incident.  Summit County John Doe 6 is

the Deputy and/or individual whose right forearm appears in the foregoing video from approximately 0:00 to 2:10.

21.     Defendant Summit County is and was at all times relevant a political subdivision and unit of local government duly organized under the laws of the State of Ohio.  Springfield Township is a political subdivision/entity and is a "person" subject to being sued pursuant to 42 U.S.C. §1983.

## FACTS

### A Call to Springfield Township Police From a Troubled Ryan Angerstien

22.     Ryan Angerstien was a 30 year-old man who lived in Springfield Township with his grandmother and uncle.  Ryan was a mental health consumer who had previously been diagnosed with mental/emotional conditions.  He received treatment for these issues at Portage Path, a local behavioral and mental health treatment facility. Unfortunately, like millions of Americans, Ryan also struggled with substance abuse and addiction.[1]

23.     On June 18, 2018, at approximately 12:56 a.m., Ryan was experiencing a mental health breakdown caused or aggravated by the use of methamphetamine.  He became paranoid, delusional and frightened.

24.     Ryan called 911 but then hung up.  The 911 dispatcher called back and spoke with Ryan's grandmother.  Springfield Township Police responded to Ryan's home.

---

[1] According to the National Survey on Drug Use and Health (NSDUH), 19.7 million American adults (aged 12 and older) battled a substance abuse disorder  in 2017.

25.     The Springfield Township officers, including but not limited to Defendant Billie Laurenti, were made aware that Ryan had a history of mental health issues, substance abuse, and had previously struggled with addiction.  She and other officers had the opportunity to observe Ryan where he exhibited extreme paranoia and other obvious signs of being in a mental health crisis and/or under the influence of drugs.  Specifically, Ryan was obsessing over an old hole in woodwork near a window.  He was convinced that there was something nefarious about this hole in the woodwork.  Officer Laurenti and other Springfield Township Police determined that Ryan was not a threat to himself or others.  The officers decided to leave Ryan with his uncle and grandmother and left the residence.

### Ryan Angerstien was a Loving and Non-Violent Person

26.     Ryan Angerstien was not a violent person.  Indeed, Ryan was never arrested for, let alone convicted of, any crime involving violence or harm to another person or their property.  Quite the contrary, Ryan was kind, loving and considerate.  He was never known to be violent or offensive.  Ryan was regarded as being a gentle person who loved animals and had a great sense of humor.  He brought joy to his friends and relatives.  Despite the fact that he did not earn a big salary, Ryan found a way to donate to charities including the Humane Society.  He was described by his family as "the sweetest person you have ever known."

27.     Unfortunately, like millions of other Americans, Ryan suffered from mental health issues and was caught up in the opioid epidemic.  He repeatedly tried rehabilitation and counseling to get help for his mental health issues and also to get help

with his addiction.  Ryan also took prescription medication for his mental health conditions.  He desperately wanted to be sober.

### A Second Call to Springfield Township Police Demonstrating Ryan Angerstien's Mental Health Further Deteriorating.

28.     Approximately an hour after leaving Ryan's home, Springfield Township Police received another 911 call regarding a man on their porch and in distress yelling for help.  The call came from a person on Nichols Road which is just down the street from Ryan's home.

29.     Ryan was banging on the neighbor's door seeking help.  He wasn't using obscenities, nor was he angry, violent, destructive or even rude.  He was terrified and needed help.

30.     Springfield Township Officer Billie Laurenti again responded to the area and located Ryan who was in the street with his uncle.  Ryan was wearing his pajama bottoms and a t-shirt.

31.     Officer Laurenti's bodycam was activated and captures most of her involvement with Ryan.

32.     From the very first moment Officer Laurenti observes Ryan, her bodycam footage reflects that Ryan's behavior is consistent with him suffering from "excited delirium".  Objectively speaking, Ryan was clearly having a mental health emergency.

**Springfield Township Police Officer Billie Laurenti's Bodycam[2] and Her
Thoughtless and Inappropriate Response to Ryan's Medical Emergency**

33.     Officer Laurenti's bodycam footage, herein captioned "Final Officer 3
Body Cam Redacted 36 Min.", the dropbox link to which is set forth herein at para. 15,
reveals the following facts.

34.     Two minutes and five seconds into Officer Laurenti's bodycam footage
(the times set forth herein are exact or close estimates and are reflected numerically), or,
at 2:05, Officer Laurenti asks, "We just saw you at your house.  What's going on?".  At
2:07 Ryan responds that he doesn't know.  Ryan is visibly distraught and sobbing.  At
2:11 Ryan, without even being asked, puts his hands up with his palms open to show that
he is unarmed and not a threat.

35.     At 2:13 Officer Laurenti tells Ryan to keep his "hands over your head and
walk towards me", which Ryan attempts to do.  Ryan is struggling to simply walk over to
the officer because of his altered mental state and makes an incoherent statement.

36.     At 2:32, Officer Laurenti, apparently oblivious to the fact that Ryan is not
adequately capable of processing information, admonishes Ryan that he is "waking
people up".

37.     Between 2:34 and 2:39 Ryan anxiously asks, "You don't have a phone?
What is that?  Oh my God!", further evidencing his delirium.  As reflected by the

---

[2] Upon information and belief, the footage of the Springfield Township Officer which is referenced
herein as "Final Officer 3 Body Cam Redacted 36 Min." is from Officer Billie Laurenti's bodycam.
However, in the event this footage, which was provided to Plaintiff's counsel in an edited format
such that names, faces and badge numbers were edited out, redacted, or obscured, is from a
different female Springfield Township Police Officer's bodycam, that Officer is also named herein
as John Doe 3 (See, Paras. 13-16, *supra*).  As such, John Doe 3 may be substituted for Officer
Laurenti throughout this Complaint, including all factual allegations and legal claims, if this Officer
has been mistakenly identified.

bodycam footage, Ryan is distracted by and scared of the light coming from Officer Laurenti's flashlight and the light from his uncle's phone.

38.     Officer Laurenti responds to Ryan's psychosis by asking, "What are you doing in the middle of the street screaming?"

39.     At 2:50, Ryan makes unintelligible statements and then says "I thought my phone went dead!  (panting and distraught)  Someone burst in the house and I ran!  Tried to find help!"

40.     At 3:24, Ryan Angerstien clearly pleads with Officer Laurenti, "**I'm scared! I don't know who to trust!  Please!**"

41.     Ryan's uncle attempts to assuage Ryan by calmly stating  "Ryan settle down."

42.     At 3:29, Officer Laurenti again admonishes Ryan by yelling at him, "Hey, you're waking people up!"

43.     Ryan then further demonstrates his delusional thinking by frantically asking, "What is that?!  What are you doing with that?!" (3:54)  To which an obviously annoyed Officer Laurenti responds "Doing with what?!", and "This is a flashlight in my hand and quit screaming waking people up!  It's 2:00 am in the morning!"  Ryan is in a state of psychosis and is terrified of Officer Laurenti's flashlight.

44.     Officer Laurenti continues to reveal her lack of training and awareness by admonishing Ryan and by asking him questions which he is not fully capable of understanding or responding to.  The video demonstrates that Officer Laurenti is getting

more and more frustrated with Ryan, his delirium, and his failure to respond in the manner she desires.

45. At 4:07, Officer Laurenti asks "Why are you walking that way?"

46. Ryan responds, "Because you guys are chasing me and my ….indecipherable)" at 4:09.

47. At 4:19, Officer Laurenti turns to the uncle and states "I don't know if you're making this worse." in an effort to have the uncle leave the scene.

48. It is worth noting that when watching Officer Laurenti's bodycam video, it is patently obvious that Ryan is struggling to simply hang on to reality. He is not evidencing any violent or even confrontational behaviors, nor is he threatening anyone. Rather, he is in a complete meltdown. Officer Laurenti knew or should have known that Ryan's behavior stemmed from having a psychotic break and/or from being under the influence of drugs. Her orders, questions and even attitude illustrate that Officer Laurenti simply believes she is dealing with a criminal who, for some reason, is waking people up.

49. At 4:28, Officer Laurenti asks the uncle, "What's he on?", to which the uncle clearly states, "Meth".

50. It is also noteworthy that Officer Laurenti never asks the uncle "What's his diagnosis?", or "Does he have a mental health issue?". Her attitude is one of a police officer who is bothered by "a druggie" and she can't even take the time to ask if Ryan Angerstien has any mental health or other physical health conditions.

51. As such, from 4:28 on, Officer Laurenti has been given reliable information as to why Ryan is behaving in such an irrational manner.

52.    Therefore, even though Officer Laurenti had the ability to inquire as to Ryan's mental health and didn't, she was given reliable information that Ryan may have been suffering from "excited delirium" and/or methamphetamine psychosis.

53.    Is is well known and was known in June of 2018 that the major warning signs of "excited delirium" include:

        a.) Paranoia;

        b.) Disorientation;

        c.) Disassociation;

        d.) Fast Heart Rate;

        e.) Possible Aggression;

        f.) Hallucination;

        g.) Sweating;

        h.) Incoherent Speech and Shouting.

54.    It is well known and was known in June of 2018 that the major warning signs of methamphetamine psychosis include:

        a.) Meth delusions:  A person has strange, unrealistic, and/or false beliefs;

        b.) Meth Hallucinations: Auditory, visual, or tactic hallucinations make a person hear, see or feel things that don't exist;

        c.) Meth paranoia:  A person becomes extremely suspicious of those around them and may even believe that people are out to get them.

55.    At 3:22 we barely see Ryan's uncle in the dark standing near Officer Laurenti.  The uncle is not holding up his phone, nor is his phone's flashlight on.  Officer Laurenti's flashlight is on.  The uncle has been soft-spoken, cooperative and is the only

person on scene whom Ryan knows. Indeed, Ryan and his uncle had a loving relationship.

56. Nevertheless, Officer Laurenti turns to the uncle and, at 4:19, says, "*I don't know if you're making this worse. You're escalating him*."

57. A few seconds later, the uncle, taking the Officer's admonition, leaves. Officer Laurenti then shouts to Ryan, "Hey Ryan, he's going home.". As such, Ryan is alone with this unknown Officer and her flashlight.

58. Not surprisingly, and in response to Officer Laurenti removing Ryan's uncle from the scene, Ryan absolutely freaks out. Ryan begins screaming and running away out of sheer terror. Indeed, Officer Laurenti recognizes how bad Ryan's response is and can be heard telling Springfield Township Police backup to "step it up".

59. Officer Laurenti, now even more annoyed, can also be heard telling dispatch that "He's running through people's yards, banging on people's doors"

60. In fact, Ryan had run to a neighbor's home and was knocking on the door asking for help.

61. Officer Laurenti gets in her car and catches up with Ryan in the front of a neighbor's house.

**Springfield Township Officer Laurenti Continues to Exacerbate the Situation by Angrily Confronting Ryan and Treating His Medical Emergency as a Serious Crime**

62. At 6:10, and with Ryan's uncle well out of the picture, Officer Laurenti's attitude becomes more confrontational and angry. She tells Ryan, "Come with me, alright?!", and "You need to quit banging on people's doors! Do you understand that?!"

63.     By 6:30, less than two minutes after dispatching with Ryan's uncle, Officer Laurenti takes an even more antagonistic tone with Ryan.  She pulls out her taser and points it directly at Ryan ordering him to "Sit down on the ground!".

64.     Petrified, Ryan lowers himself onto one knee with his hands up, palms facing Officer Laurenti.  He is clearly trying to keep himself together and is complying as best he can with Officer Laurenti orders.  She then starts to scream at Ryan to "Lay down flat on your stomach!, Do you understand me?!........Do you understand me?!".  Officer Laurenti then screams at Ryan "Don't move!".

65.     Two things are clear at this juncture of the encounter.  First, Ryan does not understand or, at a minimum, does not fully understand Officer Laurenti.  He is obviously in a compromised mental state.   Second, Officer Laurenti does not understand or is willingly ignorant to the fact that she has encountered someone fully consumed by a mental health emergency, be it "excited delirium" and/or meth psychosis.

66.     At 7:42 Officer Laurenti again admonishes Ryan that he's "[W]aking everyone up in the neighborhood screaming!" which isn't true.  Officer Laurenti is the one screaming.

67.     Officer Laurenti then screams at Ryan to "Don't move!" despite the fact that he's not moving.

68.     Officer Laurenti then yells at Ryan to "Just stay right there!", even though he is not moving.

69.     At 7:54 of Officer Laurenti's bodycam footage, Springfield Township Sergeant Troyer can be seen walking towards Ryan.  Ryan is asked to put his hands

behind his back and, in an effort to be hyper-compliant, Ryan asks "One at a time?". Again, Ryan has been submissive and non-threatening.

70.     At 7:55, Sgt. Troyer takes a hold of Ryan's hand.

71.     Ryan initially pulls his arm away but does not otherwise try to flee or grab at the Sgt.'s weapons.  He is reacting to the sensation of being touched.

72.     At 8:04, Ryan is told to lay on his stomach.  Ryan is still terrified and hesitant.  He is complying but fearful.  Sgt. Troyer is slightly behind Ryan.

73.     As this is occurring, and at 8:12, Officer Laurenti takes her flashlight in hand, points it at Ryan's face and states, "That's my Sgt., SEE?!", at which point she shines her flashlight directly into Ryan's eyes.

74.     Ryan, consistent with being in the midst of "excited delirium" and responding in a manner consistent with how he acted only a few minutes earlier when displaying abject fear of Officer Laurenti's flashlight, screams, jumps up, begins running, and screams "Oh My God, Help!".  (8:14)

75.     Ryan is almost immediately tackled and tased at 8:16 through approximately 8:27 wherein we hear Officer Laurenti state, "I don't have another cartridge."

76.     Ryan is clearly in physical pain and mental turmoil.  He runs to another house on his street, again begging and pleading for help.

### Springfield Township Sgt. Brian Troyer[3] Further Escalates the Situation by Screaming at Ryan and Ignoring His Medical Emergency

77.    Up on a small front concrete porch, Officer Laurenti and Sgt. Troyer corner Ryan and are screaming at him to lie down on his stomach despite the fact that there isn't room for him to lie down horizontally and they're blocking his ability to lie down vertically.

78.    Ryan's demeanor, physicality, presentation, speech, and manner were observed by Sgt. Troyer who knew, or should have known, that Ryan was experiencing a mental health emergency.

79.    Sgt. Troyer, also wrongly assuming Ryan can process information rationally, states that Ryan needs to lie down on his stomach to be handcuffed for Ryan's safety and the safety of the Sgt.  Ryan, however, remains in a state of mental delusion and tries to burst past the officers.  He is tackled almost immediately.

80.    Sgt. Troyer and/or Officer Laurenti and/or Officer Burket institute a second round of taser charges into Ryan.

81.    Ryan is tackled and being subject to more tasing and brutal physical abuse.  From 13:13 to approximately 15:00 Ryan can be heard screaming out in pain.  He literally begs for help time and time again.

---

[3] The footage of the male John Doe 2 Springfield Township Officer who is on top of Ryan with another Springfield Twp. Officer to restrain him (and whose forearm can be seen in "Body Cam 1 - Edited Down - Blurred") is set forth herein at para. 11.  However, in the event this bodycam footage, which was provided to Plaintiff's counsel in an edited format such that names, faces and badge numbers were edited out, redacted, or obscured, is not one of the named Defendants, or is a law enforcement agent for Summit County Sheriff's Department, that Officer is also named herein as John Doe 2 or John Doe 6(See, Paras. 10-12 and 20 *supra*).  As such, John Doe 2 or John Doe 6 may be substituted for all instances where Sgt. Brian Troyer is named throughout this Complaint, and for all factual allegations and legal claims, in the event this Officer/Deputy/Sgt. has been mistakenly identified.

82.    Upon information and belief, Officer Stephen Burket[4] arrived on scene and also tased and/or physically abused Ryan.

83.    At approximately 15:00, Ryan stops moving.  He has gone from someone in the throes of "excited delirium" to being perfectly still.

84.    In response, Sgt. Troyer and Officer Laurenti make various statements about how they detect Ryan's faint breath, and how they detect Ryan's faint heartbeat. Ryan, however, has gone from screaming in pain and panic to being totally silent and motionless.

85.    Despite the fact that Ryan is, according to the Springfield Township Police, still alive, they do nothing to administer to his medical needs.  From 15:00 to 19:33, a full four and a half minutes, Ryan remains lying on the ground, handcuffed, and with zero medical intervention.

86.    By this point, we can see other police and personnel have arrived.

87.    At 19:33, we can hear Sgt. Troyer tell one of these unidentified police that "He just stopped.  His eyes kind of rolled back in his head and **he's been low key ever since**."

88.    Contrary to Sgt. Troyer's glib assessment of Ryan, Ryan was not being "low key".  Ryan was in need of immediate, critical, life saving medical attention, none

---

[4] Upon information and belief, the footage of the male Springfield Township Officer who is another male Springfield Township Officer on scene with Ryan Angerstien  is Officer Stephen Burket. However, this bodycam footage, which was provided to Plaintiff's counsel in an edited format such that names, faces and badge numbers were edited out, redacted, or obscured, is of a different Springfield Township Officer, that Officer is also named herein as John Doe 1 (See, Para. 9, *supra*).  As such, John Doe 1 may be substituted for Officer Stephen Burket throughout this Complaint, relative to all factual allegations and legal claims, in the event this Officer has been mistakenly identified.

of which was provided to him by <u>any</u> of the Springfield Township Police or personnel on scene.

89.　　By 19:39, EMS had arrived and one of the EMS personnel asks Sgt. Troyer if they can "take the cuffs off" Ryan.

90.　　Unconscionably, and again prioritizing the police officer's narrative over a victim's need for life-saving medical care, Sgt. Troyer states, "**No.  He's going to fight"**.

91.　　Plaintiff is compelled to point out that Officer Laurenti's bodycam footage shows that at this point in the footage, Ryan had been motionless for approximately five minutes and forty-one seconds.  According to Officer Laurenti and Sgt. Troyer, he was breathing and had a "faint pulse".  It is under these circumstances that Sgt. Troyer ordered that they <u>not</u> take the handcuffs off of Ryan so that medical attention could be administered.

92.　　Officer Laurenti, recognizing the gravity of the situation, reminds Sgt. Troyer that her bodycam is on, to which Sgt. Troyer responds that he "doesn't care".

93.　　Nevertheless, none of these first responders, including but not limited to Officer Laurenti, Sgt. Troyer, Officer Burket, Deputy Catherine Phillips, or John Does 1-5 administer *any* first aid or other medical assistance to a dying Ryan Angerstien.

94.　　And when the police finally remove the handcuffs off of Ryan's motionless body, they again willingly succumb to the fictitious police narrative of "Ryan's threatening behavior" by handcuffing him to the gurney.  The Springfield police spent an inordinate amount of time handcuffing a non-responsive, motionless victim to a gurney but absolutely no time administering to Ryan's medical emergency.

95.     Indeed, nothing is perhaps more pathetic than to watch the police handcuff Ryan's lifeless wrists to the side of the gurney.  "Securing" Ryan was the final act of their performance, a morbid attempt to advance the fraud that Ryan was a threat or a danger to the police.

96.     Had Ryan, suddenly considered a violent threat to a small army of armed police and deputies, not been killed, he might have been guilty of disturbing the peace or disorderly conduct.  And that's assuming his neighbors were disturbed or would have not gotten over it and simply hoped that Ryan got the help he needed.

97.     Ryan was not armed and the police knew it.  Ryan was not wearing baggy clothes or other garments which could have concealed a weapon - a frequent justification for treating individuals with mental health issues with force.

98.     At 29:57 we hear Officer Burket observe that Ryan must have been suffering from "excited delirium".

99.     Officer Laurenti, sticking with her refusal to acknowledge what is obvious to anyone watching her bodycam, states "**I don't know what he was thinking. Paranoid…..Whatever**." at 33:16.  As if the concept of Ryan suffering from a mental breakdown and psychotic episode is simply above her pay-grade such that she didn't need to understand.  "Whatever" indeed.

**Springfield Township Sgt. Brian Troyer and/or Officer Stephen Burket Restrain Ryan Angerstien by Sitting on Him and Otherwise Putting All of Their Weight on Him.  Ryan is Crying and Begs For Help as Sgt. Troyer and/or Officer Burket Engage in Positional Asphyxiation, Literally Squeezing the Life Out of Him.  Ryan Begs for His Life and the Springfield Police Tell Him to "Shut Up", and that He's "Going To Get Charges Against Him."**

100.    Officer Burket's bodycam footage is included in a montage of bodycam footage herein captioned "Body Cam 1-Edited Down - Blurred", the dropbox link to which is set forth herein at **paragraph 11**.[5]  This footage includes portions of Springfield Township Police bodycam footage that captures Ryan's final moments.  As such, this bodycam footage reveals the following facts.

101.    Sgt. Troyer's bodycam footage herein begins with a slanted view of the driveway where Ryan Angerstien is being restrained.  Officer Burket states, "I've got this one cuffed." at 0:00 - 0:02.

102.    A handcuff can be heard closing at 0:08 although we do not see Sgt. Troyer or Officer Burket actually close the handcuff around Ryan's wrist.

103.    Ryan can be heard moaning in pain.

104.    At 0:12 Sgt. Troyer tells Ryan to "Be quiet"

105.    And at 0:14, Sgt. Troyer yells at Ryan to "Shut Up!"

106.    At 0:18 we hear a calm but determined Springfield Township Police Officer, believed to be Officer Burket, state, "Put your leg on it", immediately after which we hear Ryan begin to loudly groan.  The admonition to "put your leg on it" refers to placing as much weight on Ryan as possible - to harm him.   By 0:22 Ryan is uncontrollably screaming.

107.    He screams "HELP!" at approximately 0:27, and screams "HELP!" again at 0:29.

108.    Ryan begins sobbing and screaming for help again at 0:32.

---

[5] Plaintiff restates that the initial bodycam footage shown is that of either Springfield Township Sgt. Brian Troyer, John Doe 2 or John Doe 6.

Case: 5:20-cv-01333-JRA Doc #: 4 Filed: 06/19/20 27 of 56. PageID #: 92

109.    At 0:38 we see the right forearm of who is believed to be Sgt. Troyer steady his balance as he clearly puts all of his weight on Ryan's arm, shoulder, chest and/or upper torso.  Ryan is trying to yell out in pain to which Officer Laurenti yells, at 0:42 "Quit resisting (or) you're going to get a charge on you!"  Ryan is struggling to stay alive.

110.    When Sgt. Troyer and Officer Burket and John Doe 2 and/or John Doe 6 put even more weight on Ryan, laying across his shoulder and "using his ( substantial) weight against Ryan's midsection as leverage" to keep Ryan pinned to the ground,  he began desperately screaming "Help me!".

111.    At 0:46 seconds, we see Ryan Angerstien's left hand.  His left hand is open and the palm is facing up and towards Sgt. Troyer.  His hand is empty.  Ryan does not grab for the officers' service weapons, pepper spray, tasers, or batons.  Ryan is desperately showing the Springfield Township police a universal sign of submission, an open hand.  This gesture is the same gesture Ryan displayed moments earlier on the small, cement porch when he was signaling his submission and that he didn't want to be harmed.

112.    At 0:46 Ryan's screams have turned into begging.   In the incredibly difficult footage, we hear Ryan crying out "Help me! .... "Help me!".

113.    At 0:48, Officer Burket yells at Ryan to "Stop!" and Sgt. Troyer makes a quick but ineffective move to swat away Ryan's open hand.  Neither Sgt. Troyer nor Officer Burket actually make any real attempt to secure Ryan's hand because, as shown

in the video, doing so would entail shifting his weight off of Ryan's chest/upper torso. So Officer Burket quickly regains his position of crushing Ryan.

114.    At 0:50 through 0:51, Officer Laurenti tells Ryan the following: "We are helping you, you're resisting!"

115.    Contrary to Officer Laurenti's assertion, Sgt. Troyer's bodycam footage reflects that the Springfield Township Police are decidedly *not* helping Ryan.  Sgt. Troyer and Officer Burket are literally crushing the life out of Ryan Angerstien.  These Officers are on top of Ryan and are leveraging all their weight on Ryan's upper torso/chest.  Ryan was in the throes of a medical emergency when the Springfield Township Police first encountered him.  Ryan was at all times unarmed and non-threatening.  Ryan had not committed a crime of violence or even one of moral turpitude.  At no point did Ryan reach for an officers' weapons or otherwise try to strike an officer.  As Ryan told Officer Laurenti from the start, "I'm scared and I don't know who to trust."  As such, at the time Officer Laurenti states, "We are helping you, you're resisting", he is restrained and is being crushed by Sgt. Troyer.

116.    Upon information and belief, Officer Laurenti finds another taser cartridge and actually *tases* Ryan while he's being restrained by Sgt. Troyer and Office Burket.

117.    From 0:50 to 1:06, Ryan's screams for help become incoherent, softer.  He begins to make guttural noises as opposed to articulating a need for help.

118.    At 1:10, Sgt. Troyer sits up while still on Ryan to look toward backup police units that have arrived.  He does not secure Ryan's left hand which, at 1:17, we can see is limp and resting on the pavement.

119.    Plaintiff submits that by the 1:17 mark in "Body Cam 1-Edited Down - Blurred", Ryan Angerstien is dead.  He's gone from running and screaming and begging for his life to a silent, still body.

120.    As previously indicated, it is at this point that Sgt. Troyer and the other Springfield Township Police purposefully engage in a sad game of deception.  At 1:17 Sgt. Troyer states for the benefit of the bodycam that "He's (Ryan) pretty fucking strong" when in reality, Ryan's dead.

121.    Officer Laurenti states "His eyes are rolling in the back of his head" at 1:21.

122.    From 1:21 to 1:26, we see Sgt. Troyer adjust his weight while still sitting on Ryan, and Ryan's lifeless body moves with pressure of Sgt. Troyer's.

### Ryan Angerstien was Subjected to the All This Abuse While Handcuffed

123.    For only a second, but clearly, and before the Springfield Township Police have an opportunity to quickly roll Ryan onto his stomach, at exactly one minute and twenty-five seconds into 1:25 "Body Cam 1-Edited Down - Blurred", (the dropbox link to which is set forth herein at **paragraph 11**), we can see that Plaintiff Ryan Angerstien is fully handcuffed.  That is to say, for some time Ryan has been crying and begging for help, the duration of which Sgt. Troyer and Officer Burket have been pressing all of their weight onto Ryan's upper torso and chest, *Ryan Angerstien has been handcuffed*.

124.    As soon as Summit County Sheriff Deputy Catherine Phillips arrives on scene, viewable at 1:27, Officer Laurenti, Sgt. Troyer, and/or Officer Burket frantically begin calling to "Roll him over!", "Roll him over!" at 1:26, and so they try to roll Ryan's

limp, lifeless body onto his stomach.  Again, Plaintiff submits that the only reason why Sgt. Troyer, Officer Laurenti and Officer Burket hurriedly insisted on rolling a handcuffed, dead person onto his stomach is to either create a false reality for the camera - actions which suggest that Ryan *had* to be rolled over because he was a threat to officer safety when, of course, he wasn't.  Or, they want Ryan on his stomach because they suddenly appreciate that they've killed a handcuffed man who was unarmed and experiencing a medical emergency - and they don't want clearer evidence of him being handcuffed during the course of their abuse.

125.    This theater continues at 1:30-1:33 when Sgt. Troyer anxiously orders the other officers to "Cuff 'em up! Cuff 'em up! Cuff 'em up!".  Plaintiff is compelled to question, "Cuff *who* up, exactly? And why?"  Ryan is already cuffed and he's lifeless.

126.    Plaintiff submits that this isn't just theater, but rather, it's something much more sinister.  Repeatedly ordering "Cuff 'em up!" is the intentional and pseudo-urgent call to secure a "dangerous" individual for "officer safety".  Or at least that's what the police are hoping nearby neighbors and bodycams capture.  In reality, these are the intentional and desperate acts of police who are suddenly flooded with the dread that their inexcusably aggressive behavior has suddenly caught up with them.  Plaintiff submits that if you listen to the police's urgent calls to handcuff Ryan, but then look at Ryan's body, you'll appreciate that it's nothing short of an almost unimaginable fraud.

127.    The aforementioned statements are not interposed for flippancy or rhetoric.  Ryan Angerstien needed immediate medical attention and he was already restrained.  To the degree he was in need of chest compressions, CPR and/or other

life-saving measures, rolling him onto his stomach made performing such urgent steps impossible.  In this way, Sgt. Troyer, Officer Laurenti and Officer Burket acted to deny, and indeed impaired, Ryan Angerstien from obtaining life saving medical attention and they did it to protect themselves from liability.

128.    At 1:47, the police, for some reason, decide to handcuff Ryan behind his back.

129.    After getting up off of Ryan, Sgt. Troyer, Officer Burket and/or Officer Laurenti begin to act as if Ryan just then passed out or went unconscious.

130.    At 2:11-2:12, Sgt. Troyer states that he "feels a pretty faint pulse". Plaintiff submits that no, he didn't.

131.    Assuming *arguendo* Sgt. Troyer felt a "faint pulse", it is worth noting that no one is making any attempts to save Ryan's life.  Also at 2:12 we see Officer Laurenti present with her flashlight shining near Ryan's legs.

132.    Officer Laurenti is not providing emergency medical care despite an obvious need.

133.    At 2:16 we see Ryan Angerstien with his pajama bottoms pulled below his hips, laying face down with his hands cuffed behind his back.  Springfield Township John Doe 4 comes up to Ryan and puts his fingers on Ryan's neck, presumably looking for a pulse.

134.    At 2:20, Office Laurenti turns towards the camera, touches her face and states, "He's got a pulse."

135.    John Doe 4 and John Doe 5, also a Springfield Township Fire or EMS personnel, do not seem to care that Ryan is allegedly breathing or that he still has a pulse. These two Springfield Township employees or agents offer no immediate or emergency medical care at all.  John Doe 4 and John Doe 5 are presumably on scene because other Springfield Township Police finally got around to appreciating that Ryan was suffering a medical emergency.   Yet the bodycam footage from both "Body Cam 1-Edited Down - Blurred" (para. 11) and "Final Officer 3 Body Cam Redacted - 36 - Min." (para. 15) shows these two Fire/EMS employees acting in a decidedly non-emergency manner. These "emergency responders" have been informed that Ryan Angerstien: 1.) has a faint pulse; 2.) his eyes have rolled back into his head; and 3.) he is barely breathing.

136.    Clearly then, Ryan Angerstien is in desperate need of emergency medical care.  Yet John Doe 4 and 5 provide no care.

137.    John Doe 4 and John Doe 5's conduct in terms of disregarding Ryan Angerstien's emergency medical needs was wilful, wanton, reckless, malicious, and fell below the standard of care for emergency medical professionals.

138.    At approximately 2:45 of "Body Cam 1-Edited Down - Blurred" one can hear Office Burket make the statement, again for the benefit of everyone's bodycam, that Ryan better be cuffed to the gurney for "when he wakes up", and "He was all cut up before we had 'em" at 2:51.

139.    From 2:35 of "Body Cam 1-Edited Down" to 4:03 we watch the police cuff the dead, naked body of Ryan Angerstien to the EMS gurney.

140.    If Ryan Angerstien was still alive at the time he's being handcuffed to the gurney, and we have to assume he was or else why are the Defendants bothering to handcuff him to the gurney and talking about when Ryan "wakes up", these Defendants spent almost a minute and a half cuffing his unconscious body to a gurney instead of providing him with emergency medical care.  Plaintiff submits that Ryan Angerstien received essentially no medical care whatsoever.  Rather, these Defendants interfered with him obtaining necessary medical care and acted in a wanton, wilful, reckless and malicious manner.

141.    Furthermore, from 4:03 to 4:17, the bodycam footage from "Body Cam 1 - Edited Down - Blurred", believed to be Sgt. Troyer's, intentionally covers up the camera. This act was done consciously and constitutes the destruction or failure to preserve evidence, spoliation, and/or interference with Ryan Angerstien's civil rights in violation of ORC §2921.45(B).

### Springfield Township's History of Treating Individuals Who Are Suffering a Medical Emergency as if They Are Criminals Which Results in Death

142.    Officer Laurenti, as well as Sgt. Troyer and Officer Burket, should, however, have known what Ryan was going through as this is not the first time the Springfield Township Police have killed a suspect who was experiencing "excited delirium".

143.    On September 8, 2015, at approximately 3:12 p.m., the Springfield Township Police received a 911 call from Wendy Tomblin regarding her son Jordyn Miller.  According to the Tomblin, Jordyn was having a "*psychotic break*" and was "*running around the driveway naked*."

144. The Springfield Township 911 Dispatcher told Ms. Tomblin that her son was not going to be hurt and that "*We're gonna get him some help*."

145. Shortly thereafter, Springfield Township police were advised that Jordyn was now wearing clothes but that he had run off.

146. Eyewitnesses indicated to the police that Jordyn appeared "disoriented", "confused", and "incoherent", but that he also appeared to be non-threatening and non-dangerous. Jordyn was reported to be mentally ill or on drugs or both.

147. At approximately 3:19 p.m., the Springfield Township Police received another call from a woman who stated that an unknown man had gotten into her Jeep which was parked in her driveway. He was just sitting there and the Jeep was not running. Dispatch told the woman to just "*leave him alone*" and that the man had "*mental problems*".

148. When the police arrived at the woman's home, Jordyn was inside her Jeep and several people were surrounding the Jeep, holding the doors shut. One individual told the Springfield Township Police that Jordyn was "trying to steal" the Jeep.

149. The responding Springfield Township Officers decided to escalate the situation by dragging Jordyn out of the vehicle and forcing him into a confrontation. Rather than simply calling for EMS to help them deal with a medical emergency, the police had to drag the delusional Jordyn out of the vehicle and then wrestle with him.

150. The Springfield Police also screamed a series of orders at Jordyn despite fully knowing that he was confused, incoherent, delusional, and possibly under the influence of drugs.

34

151.    Jordyn, not being able to comprehend and/or fully appreciate what the police were screaming, resisted.

152.    Based on his resistance, the police physically abused and repeatedly tased Jordyn.

153.    Similar to Ryan Angerstien, Jordyn Miller died as a result of the physical restraint and/or tasing inflicted by the Springfield Township Police Department.

154.    Despite this tragedy, the Springfield Township Police failed to implement adequate policies, practices, customs and training that would have prevented the subsequent death of Ryan Angerstien in 2018.  As such, and as a direct and proximate cause of Springfield Township's inadequate policies, practices, customs and training, Ryan Angerstien suffered physical pain, mental and emotional anguish and death.

## FIRST CAUSE OF ACTION
### (42 U.S.C. § 1983 Against Defendants Laurenti, Troyer, Burket, John Does 1-3, 6 for Excessive Force in Violation of the Fourth and Fourteenth Amendment Pre-Positional Death/Asphyxiation)

155.    Paragraphs 1 through 154 are incorporated by reference herein as if fully rewritten.

156.    Defendants Laurenti, Troyer and Burket, and John Does 1-3, 6 acting under color of law and within the course and scope of their employment as law enforcement officers with the Springfield Township Police Department and/or Summit County, used unnecessary, unreasonable, outrageous, deadly and excessive force on Ryan Angerstien in violation of his clearly established rights guaranteed by the Fourth and/or Fourteenth Amendments to the United States Constitution.

157.    Defendants Laurenti, Troyer, Burket and John Does 1-3, 6's use of unnecessary, unreasonable, outrageous, deadly and excessive force as set forth herein constitutes willful, wanton, reckless, unlawful and malicious conduct.  As such, Plaintiff is entitled to punitive damages.

158.    Faced with the circumstances present at the aforementioned time and place, a reasonably prudent law enforcement officer would or should have known that the use of force described herein violated Ryan Angerstien's clearly established Fourth and/or Fourteenth Amendment rights to be free from excessive force.

159.    Ryan was repeatedly being tased and screamed at despite the fact that he was under the influence of narcotics and not coherent enough to comply or to fully comply.  That is to say, the Springfield Township Officers knew or should have known that Ryan was in a mentally compromised state.  These Officers knew or should have known that due to drug use and/or mental health issues Ryan was not coherent such that their orders would not be followed or followed entirely.  After observing Ryan for several minutes, it was obvious or should have been obvious to the Officers that Ryan was suffering from a mental breakdown and was in a state of despair and/or "excited delirium".

160.    These same Officers knew or should have known that repeatedly tasing a restrained suspect under these circumstances was a violation of his Constitutional rights.

161.    These same Officers knew or should have known that repeatedly tasing a restrained suspect who was exhibiting excited delirium or a lack of coherence due to the use of drugs was improper, unlawful, and would likely lead to a poor outcome.

162.     These same Officers knew or should have known that repeatedly tasing a restrained suspect while he's on the ground could or would likely result in a fatality or other serious physical harm.

163.     Indeed, and as demonstrated by the bodycam video, Ryan never posed a serious risk of danger to the Officers or others.  Yet the Officers continued to tase and otherwise physically assault Ryan while he was restrained.

164.     As a direct and proximate result of the Officers' relentless and overzealous tasing of a man who was in the throes of a physical, mental and emotional breakdown, Ryan Angerstien stopped breathing.

165.     As a direct and proximate result of these Defendants' use of force in violation of Ryan Angerstien's Fourth and/or Fourteenth Amendment rights, Plaintiff's Decedent suffered injury and death and his next of kin have suffered economic and non-economic damages, including but not limited to the wrongful death of their loved one, as well as emotional pain and suffering, all of which will continue into the future.

### SECOND CAUSE OF ACTION
### (42 U.S.C. § 1983 Against Defendants Laurenti, Troyer, Burket, and John Does 1-3, 6 for Excessive Force in Violation of the Fourth and Fourteenth Amendment Positional Asphyxiation and/or Death Caused or Contributed to by Improper Restraint)

166.     Paragraphs 1 through 166 are incorporated by reference herein as if fully rewritten.

167.      Defendants Laurenti, Troyer, Burket and John Does 1-3, 6 acting under color of law and within the course and scope of their employment as law enforcement officers with the Springfield Township Police Department and/or Summit County, used

unnecessary, unreasonable, outrageous, deadly and excessive force on Ryan Angerstien in violation of his clearly established rights guaranteed by the Fourth and/or Fourteenth Amendments to the United States Constitution.

168.    Defendants Sgt. Royer and/or Officer Burket and/or Officer Laurenti and/or John Does 1-3, 6 restraint of Ryan Angerstien was an unlawful implementation of positional asphyxiation and/or otherwise caused or contributed to his untimely death. These Defendants used unnecessary, unreasonable, outrageous, deadly and excessive force when they restrained Ryan Angerstien in the manner described herein and as as set forth in the bodycam videos referenced herein.

169.    These Defendants' use of force as set forth herein constitutes willful, wanton, reckless, unlawful and malicious conduct.  As such, Plaintiff is also entitled to punitive damages.

170.    Faced with the circumstances present at the aforementioned time and place, a reasonably prudent law enforcement officer would or should have known that the use of force and method of restraint as described herein violated Ryan Angerstien's clearly established Fourth and/or Fourteenth Amendment rights to be free from excessive force.

171.    Ryan can be heard literally begging and screaming for his life.  He pleads with these officers to help and he demonstrates submission.  Yet Ryan Angerstien was subjected to a restraint that amounted to positional asphyxiation which caused him pain, suffering, mental anguish, and ultimately his life.

172.    These same Officers knew or should have known that restraining Ryan in the manner they employed, *while he was handcuffed,* was a violation of Ryan's Constitutional rights.

173.    Indeed, and as demonstrated by the bodycam video, Ryan never posed a serious risk of danger to the Officers or others, certainly not once he was handcuffed. Yet the Officers continued to use a restraint method that amounted to positional asphyxiation which led to Ryan's untimely death.

174.    As a direct and proximate result of the Officers' relentless and overzealous restraint of a handcuffed man having a medical emergency, a man in the throes of a physical, mental and emotional breakdown, Ryan Angerstien stopped breathing.

175.    As a direct and proximate result of these Defendants' use of force in violation of Ryan Angerstien's Fourth and/or Fourteenth Amendment rights, Plaintiff's Decedent suffered injury and death and his next of kin have suffered economic and non-economic damages, including but not limited to the wrongful death of their loved one, as well as emotional pain and suffering, all of which will continue into the future.

**THIRD CAUSE OF ACTION**
**(42 U.S.C. § 1983 Supervisory Liability Against Defendants Hoover and Troyer in Their Individual Capacities)**

176.    Paragraphs 1 through 175 are incorporated by reference herein as if fully rewritten.

177.    Defendants Laurenti, Burket and John Does 1-5 were the subordinates of Defendants Troyer and/or Chief Hoover.  Troyer was also a subordinate of Defendant Chief Hoover.

178.    As alleged herein, Ryan Angerstien's rights were violated by Defendants Laurenti, Troyer, Burket and John Does 1-5.

179.    Defendants Troyer and Chief Hoover were personally involved in the violation of Ryan Angerstien's rights by, among other acts:

    i.    Directly participating in the conduct of subordinate Defendants by acquiescing to and failing to intervene to correct the actions of the subordinates once it was known that these actions were occurring;

    ii.    Failing to train their subordinates, including these named Defendants, on topics including but not limited to engaging in crisis interventions, interacting with mentally ill individuals or individuals who they know or have reason to believe are experiencing the ill effects of drug use, de-escalation techniques, tasing and other use of force measures, restraining individuals, properly restraining individuals, the amount of force that can be used on a handcuffed suspect, positional asphyxiation, requesting and providing medical care when the need for additional training was apparent throughout their actions and inactions, creating a policy, practice, or custom in which violations occurred;

    iii.    Consistently failing to supervise and train their subordinates, including these named Defendants, such that the violation of a citizen's rights were highly predictable under the usual and recurring circumstances and did occur against Ryan Angerstien in the manner predicted;

    iv.    Remaining deliberately indifferent to and consciously disregarding the rights of citizens and civilians by failing to act on information that Constitutional rights were being violated.

180.    Defendants Hoover and Troyer's failures to supervise and train, and their participation in the conduct of their subordinates was affirmatively linked to the violations of Ryan Angerstien's state and federally protected rights.

181.    As a direct and proximate result of Defendants Hoover and Troyer's failure to supervise and train their subordinates, and in participating in their course of conduct, Ryan Angerstien was forced to endure and suffer severe physical, mental, and emotional injuries and death.

182.    In failing to train and supervise and by participating in their subordinates conduct, Defendants Hoover and Troyer acted wantonly, willfully, recklessly, maliciously, without legal justification and with deliberate indifference to Ryan Angerstien's federally protected rights warranting the imposition of exemplary punitive damages.

### FOURTH CAUSE OF ACTION
### 42 U.S.C. § 1983 Against Defendants Laurenti, Troyer, Burket, and John Does 1-6, and Deputy Phillips for Deliberate Indifference to Serious Medical Needs in Violation of the Eighth and/or Fourteenth Amendment

183.    Paragraphs 1 through 182 are incorporated by reference herein as if fully rewritten.

184.    The Defendants observed Ryan Angerstien and objectively knew he was in a state of mental and emotional breakdown. Springfield Township was specifically on notice of his delusional and paranoid behavior.

185.    These Defendants were put on actual notice that Ryan was in the throes of a mental health and physical crisis.  Ryan Angerstien was clearly experiencing a crisis stemming from mental health issues or induced by narcotics.

186.    These Defendants witnessed that Ryan Angerstien was experiencing a medical condition known as "excited delirium" and/or "meth psychosis" or other mental health emergency.

187.    Defendants knew, both by report and by observation, that Ryan Angerstien required medical intervention and hospitalization for his condition.

188.    Ryan Angerstien was entitled to care and treatment for his serious medical condition.

189.    Defendants responded to Ryan Angerstien's medical condition with force by forcefully restraining him as he struggled, restraining him in a prone position, and repeatedly tasering him.

190.    Ryan Angerstien was also entitled to care and treatment for those physical injuries he suffered at the hands of the police, including those he sustained as a result of being tased, tackled, assaulted and restrained by the police.  However, Ryan did not receive care or treatment for these serious medical conditions and as a direct and proximate result sustained physical pain, emotional and mental anguish, and death.

191.    Also, and as set forth herein, these Defendants failed to provide Ryan Angerstien with emergency medical care following his restraint.  Several Defendants and witnesses indicate that Ryan Angerstien was still alive but that he was exhibiting symptoms of being in a medical emergency and/or close to death.

192.     None of these Defendants, despite their legal duties, responded to Ryan Angerstien's emergency medical needs.

193.     Rather, and based on the facts set forth herein, these Defendants interfered with Ryan Angerstien obtaining necessary and life-saving medical care.  As such, their conduct in this regard was wilful, wanton, reckless and malicious.  Interfering with Ryan's ability to receive emergency medical care was a violation of his Constitutional rights.

194.     Defendants were therefore deliberately indifferent to Ryan Angerstien's serious medical needs in violation of his rights as protected by the Eighth and/or Fourteenth Amendments to the United States Constitution.

**FIFTH CAUSE OF ACTION**
**(42 U.S.C. § 1983 Against Defendant Springfield Township, Chief Hoover and Summit County for Failure to Train and Supervise and for Customs, Policies, and Practices Causing Violations of the Fourth and/or Fourteenth Amendment)**

195.     Paragraphs 1 through 194 are incorporated by reference herein as if fully rewritten.

196.     Upon information and belief, as well as those facts surrounding the death of Jordyn Miller, Plaintiff submits that the Springfield Township Police and Summit County have a history of violating citizens' Constitutional rights, using excessive, unreasonable and deadly force, unlawful restraints, and acting with deliberate indifference to the serious medical needs of individuals under their care, custody, and control about which Defendants Springfield Township and Chief Hoover were aware.

197.    Also based on information and belief, as well as the facts surrounding the death of Jordyn Miller, Defendant Springfield Township and/or Chief Hoover failed to adequately and properly train and/or supervise Defendants Laurenti, Troyer, Burket, Laurenti and John Does 1-5 and/or other Springfield Township employees relative to crisis intervention, use of force, encountering individuals with mental and/or medical conditions, addressing individuals with "excited delirium" and/or "meth psychosis", providing adequate medical care, restraining individuals, positional asphyxia, excessive force, interfering with individual's civil rights and other areas of training relevant to the matter herein.  Summit County also failed in these respects as to Defendants Deputy Catherine Phillips and John Doe 6.

198.    On information and belief, Defendants Springfield Township and/or Chief Hoover and Summit County implemented and/or tolerated customs, practices, and/or policies relative to the training and supervision of Springfield Township police officers and other employees on seizures, use of force, providing medical care, addressing individuals experiencing "excited delirium" and/or "meth psychosis", restraining individuals, positional asphyxia, excessive force, interfering with individual's civil rights and other areas of training relevant to the matter herein which on their face were violative of the Fourth Amendment.

199.    Alternatively, on information and belief, Defendants Springfield Township and Chief Hoover and/or Summit County implemented otherwise facially valid customs and policies in a manner such that Constitutional violations were likely to occur and did occur and impacted individuals including but not limited to Ryan Angerstien.

200.     As a direct and proximate result of Defendants Springfield Township and Chief Hoover's and Summit County's customs, policies, and practices described herein, which violate the Fourth and/or Fourteenth Amendments on their face, or otherwise as applied in a manner such that violations of the Fourth and Fourteenth Amendments were likely to occur and did occur, Ryan Angerstien was forced to endure and suffer severe physical pain, mental and emotional distress, and loss of life.

## SIXTH CAUSE OF ACTION
### (42 U.S.C. § 1983 Against Defendant Springfield Township, Chief Hoover and Summit County for Customs, Policies, and Practices Causing Violations of the Fourth and/or Fourteenth Amendment Through Ratification)

201.     Paragraphs 1 through 200 are incorporated by reference herein as if fully rewritten.

202.     Defendants Springfield Township and/or Chief Hoover, each of whom had final policymaking authority, ratified the conduct of Defendants Laurenti, Troyer, Burket, Laurenti and John Does 1 - 5 as described herein and/or otherwise failed to investigate or punish said conduct.  Summit County similarly ratified Defendant Deputy Phillips' and John Doe 6's conduct.

203.     Defendants Springfield Township and/or Chief Hoover's ratification as referenced above constitutes an official policy of Defendant Springfield Township and/or Chief Hoover, as does Summit County's ratification.

204.     Defendants Springfield Township and/or Chief Hoover's and Summit County's ratification and/or failure to investigate or punish as described herein renders

them liable to the Estate of Plaintiff's Decedent, Ryan Angerstien, for the Constitutional violations alleged herein in accordance with *Marchese v. Lucas,* 758 F. 2d 181 (6th Cir., 1985) and its progeny.

205.    As a direct and proximate result of Defendants Springfield Township and Chief Hoover's and Summit County's ratification as set forth herein, Ryan Angerstien suffered severe physical pain, mental and emotional distress and death.

### SEVENTH CAUSE OF ACTION
### (Willful, Wanton, Reckless, Malicious, and Bad Faith Conduct Against Defendants Laurenti, Troyer, Burket, Laurenti, Phillips and John Does 1-6)

206.    Paragraphs 1 through 205 are incorporated by reference herein as if fully rewritten.

207.    As set forth herein, Defendants Laurenti, Troyer, Burket, Laurenti, Phillips, and John Does 1-6 failed to exercise due care and acted in a willful, wanton, reckless, malicious and/or in bad faith manner while engaged in police functions and which culminated in the death of Ryan Angerstien such that they are not entitled to the defenses and immunities for negligent conduct as set forth in O.R.C. §2744.01 *et seq.*

208.    The Defendants failed to recognize that Ryan was experiencing a mental health crisis and needed immediate medical attention.  They antagonized Ryan and took ill-advised steps which were contrary to proper police training and procedures.  They utilized improper restraint methods, failed to intervene when the need to intervene on behalf of Ryan Angerstien was obvious and they had the opportunity.  They failed to provide emergency medical care.  They took steps which hindered the provision of

medical care.  They failed, in one way or another, to protect Ryan's civil rights and/or to prevent his rights from being violated.  These mistakes and other mistakes as set forth herein were made in a wanton, wilful, reckless and/or malicious manner.

209.    The failure of these Defendants to treat Ryan's crisis as a medical emergency is what initially led to him suffering bodily harm through tasing and unlawful restraint.

210.    Further, the failure of these Defendants to treat Ryan's crisis as a medical emergency also prevented him from obtaining the medical care he so desperately needed. These and other failures were wanton, wilful, reckless and/or malicious.

211.    In addition to the failure to treat Ryan's crisis as a medical emergency, these Defendants took affirmative steps which made the situation worse and which caused and/or contributed to Ryan's injuries and death. and which steps were made in a wanton, wilful, reckless and/or malicious manner.

212.    These Defendants' actions and/or omissions, including but not limited to their inappropriate use of force, escalating rather than de-escalating their encounter with Ryan, failing to recognize and properly address situations involving individuals in mental health crises such as "excited delirium" and/or "meth psychosis", failing to provide or obtain adequate medical care, and otherwise acting or failing to act in an appropriate manner consistent with their legal duties relative to Ryan Angerstien was wilful, wanton, reckless and/or malicious.

213.    As a direct and proximate result of these Defendants' acts and omissions as set forth herein, Ryan Angerstien suffered severe physical injuries, emotional and mental distress, and death.


### EIGHTH CAUSE OF ACTION
### (Assault and Battery Against Defendants Laurenti, Troyer, Burket, and John Does 1-3, 6)

214.    Paragraphs 1 through 213 are incorporated by reference herein as if fully rewritten.

215.    Officers Laurenti, Troyer, Burket and John Does 1-3, 6 as set forth herein, constitute assault and battery.  These Defendants threatened Ryan Angerstien with bodily harm and said threats caused him to be in fear of imminent peril and death.

216.    These Defendants also had apparent authority and the ability to carry out the threats of bodily harm and did intentionally and without permission offensively touch and injure Ryan Angerstien.

217.    These Defendants assaulted and battered Ryan Angerstien with a malicious purpose, in bad faith, or in a reckless, willful, and/or wanton manner.

218.    As a direct and proximate result of being assaulted and battered by these Defendants, Ryan Angerstien suffered severe physical pain, emotional and mental distress, and death.


### NINTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress Against Defendants Laurenti, Troyer, Burket, Laurenti, Phillips and John Does 1-6)

219.    Paragraphs 1 through 218 are incorporated by reference herein as if fully rewritten.

220.    Defendants Laurenti, Troyer, Burket, Laurenti, Phillips and John Does 1-6 either intended to cause emotional distress or knew or should have known that their actions would result in serious emotional distress to Ryan Angerstien.

221.    These Defendants engaged in conduct so outrageous as to go beyond all possible bounds of decency and was utterly intolerable in a civil society.

222.    As a direct and proximate result of these Defendants' actions and inactions, Ryan Angerstien suffered psychic injury prior to his death; and the mental anguish suffered by Ryan Angerstien was serious and of a nature that no reasonable person could be expected to endure.

223.    These Defendants' infliction of emotional distress was also willful, wanton, reckless, malicious and/or in bad faith.

### TENTH CAUSE OF ACTION
#### (Negligent Hiring, Training, Retention, Discipline and Supervision Against Springfield Township, Chief Hoover and Summit County)

224.    Paragraphs 1 through 223 are incorporated by reference herein as if fully rewritten.

225.    Defendants Springfield Township and/or Chief Hoover employed Defendants Laurenti, Troyer, Burket, Laurenti and John Does 1-5.  Summit County employed Deputy Phillips and John Doe 6.

226.    Defendants Springfield Township and/or Chief Hoover, knew or should have known that Defendants Laurenti, Troyer, Burket, Laurenti and/or John Does 1-5 had

a propensity for using unlawful force, escalating rather than de-escalating volatile situations, failing to recognize and properly address situations involving individuals in mental health crises such as "excited delirium" and/or "meth psychosis", failing to provide or obtain adequate medical care, unlawful restraint, restraining in a manner which would result in positional asphyxiation, using force against a handcuffed individual, and otherwise acting or failing to act in an appropriate manner consistent with their legal duties in situations similar to the one they faced with Ryan Angerstien.

227.    Defendants Springfield Township and/or Chief Hoover also failed to adequately train Defendants Laurenti, Troyer, Burket, Laurenti and/or John Does 1-5 relative to the use of lawful force, escalating rather than de-escalating volatile situations, recognizing and properly addressing situations involving individuals in mental health crises such as "excited delirium" and/or "meth psychosis", providing or obtaining adequate medical care, unlawful restraint, restraining in a manner which would result in positional asphyxiation, using force against a handcuffed individual, and otherwise acting in an appropriate manner consistent with their legal duties in situations similar to the one they faced with Ryan Angerstien.

228.    Defendants Springfield Township and/or Chief Hoover also failed to adequately discipline and/or supervise Dendants Laurenti, Troyer, Burket, Laurenti, and John Does 1-5 relative to these Defendants' propensity for using unlawful force, escalating rather than de-escalating volatile situations, failing to recognize and properly address situations involving individuals in mental health crises such as "excited delirium" and/or "meth psychosis", failing to provide or obtain adequate medical care, unlawful

50

restraint, restraining in a manner which would result in positional asphyxiation, using force against a handcuffed individual, and otherwise acting or failing to act in an appropriate manner consistent with their legal duties in situations similar to the one they faced with Ryan Angerstien.

229.    Defendant Springfield Township and/or Chief Hoover's negligence and/or willful, wanton, and/or reckless conduct in hiring, training, disciplining, retaining and/or supervising Defendants Laurenti, Troyer, Burket, Laurenti and John Does 1-5 was the direct and proximate cause of Ryan Angerstien's severe physical pain, emotional and mental distress, and death.

### ELEVENTH CAUSE OF ACTION
#### (Failure to Intervene)

230.    Paragraphs 1 through 229 are incorporated by reference herein as if fully rewritten.

231.    Defendants Laurenti, Troyer, Burket, Laurenti, Phillips and John Does 1-6 all had the opportunity as well as the legal duty to intervene on behalf of Ryan Angerstien so as to prevent his rights from being violated, or to curtail the violation of his rights.

232.    Each of these Defendants failed in this regard and are therefore liable.

233.    These Defendants actions and inactions were under color of law and deprived Ryan Angerstien of federally protected rights.

234.    These Defendants actions and inactions were wilful, wanton, reckless and/or malicious and also deprived Ryan Angerstien of his rights under the State of Ohio and the Ohio Constitution.

235.    As a direct and proximate result of the wrongful acts and omissions as set forth herein, these Defendants caused Ryan Angerstien to suffer extreme physical pain, severe mental and emotional distress, and loss of life.

**TWELFTH CAUSE OF ACTION**
**(Spoliation of Evidence, Interference with Civil Rights, and Conspiracy to Interfere With Civil Rights Pursuant to 42 U.S.C. §1985)**

236.    Paragraphs 1 through 235 are incorporated by reference herein as if fully rewritten.

237.    Defendants Defendants Laurenti, Troyer, Burket, Laurenti, Phillips, Springfield Township, Summit County and John Does 1-6 all interfered with Ryan Angerstien's civil rights in violation of ORC § 2921.45(B) and they conspired to interfere with his civil rights in violation of 42 U.S.C. § 1985.

238.    Further, and as set forth in paragraph 131, a Springfield Township Defendant intentionally obscured his or her bodycamera so as to destroy evidence and to interfere with Ryan Angerstien's civil rights.

239.    Also, and as reflected in the BCI report, one of the Springfield Township Officers reported that his bodycamera "fell off" his person - not while engaged with Ryan Angerstien, but while running from one house to another.  As it turns out, this bodycam footage is critical as it would have captured another angle of Ryan's death.  The missing

footage would have recorded Ryan Angestien's arrest, tasing, restraint and death have caused Plaintiff damages.

240.    Furthermore, however, these Defendants engaged in a conspiracy to interfere with Ryan Angerstien's civil rights.

241.    First, as indicated, the Ohio Attorney General's Office, through the Bureau of Criminal Investigation (BCI), conducted or tried to conduct an investigation into this in-custody death.

242.    BCI agent SA Charles H. Snyder, #90, requested the Summit County Sheriff's Office to produce "any reports, videos, recordings, or other documentation on this incident filed by Summit County Sheriff's Office".

243.    The Summit County Sheriff's Office told BCI agent Snyder that they had provided all these materials to Springfield Township Police Department.

244.    When BCI Agent Snyder contacted the Springfield Township Police Department for the records, Springfield Township Police stated that they never received or took possession of Summit County's materials.

245.    BCI Agent Snyder then went back to Summit County to inquire as to the whereabouts of the records, videos, and any information filed with Summit County regarding this death, and the County advised they had no such records pertaining to the matter.  All of this is captured in Agent Snyder's 6/26/18 letter, attached hereto and incorporated herein.

### THIRTEENTH CAUSE OF ACTION
### (Wrongful Death)

246. Paragraphs 1 through 245 are incorporated by reference herein as if fully rewritten.

247. As a direct and proximate result of the Defendants' acts and omissions as set forth herein, individually and/or collectively, Plaintiff's Decedent, Ryan Angerstien, suffered his untimely and wrongful death.

248. As a direct and proximate result of Ryan's wrongful death, Ryan's next of kin have and will forever suffer those injuries and damages as set forth in Ohio's wrongful death statutes.

249. Raymond Angerstien, Ryan's father, is the Administrator of Ryan's Estate. Raymond Angerstien brings this action pursuant to Ohio Revised Code §2125.02, *et seq*.

## FOURTEENTH CAUSE OF ACTION
### (Survivorship Action)

250. Paragraphs 1 through 249 are incorporated by reference herein as if fully rewritten.

251. As the Administrator of the Estate of Ryan Angerstien, Plaintiff Raymond Angerstien also brings this action for the injuries, conscious pain and suffering, and all other damages his son Ryan Angerstien suffered prior his death and for the benefit of his Estate.

## DAMAGES

252. Paragraphs 1 through 251 are incorporated by reference herein as if fully rewritten.

253.    As a direct and proximate result of the Defendants' acts, omissions and misconduct, Ryan Angerstien sustained, prior to his death, fear for his life and traumatic shock to his physical, mental and emotional well-being.

254.    As a further direct and proximate result of the Defendants' acts, omissions and misconduct, and as a result of the wrongful death of Ryan Angerstien, his survivors, next of kin, and/or heirs have suffered damages, including but not limited to the loss of his support, services, society, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training and education.

255.    As a further direct and proximate result of the wrongful death of Ryan Angerstien, the Decedent's survivors, next of kin, and/or heirs have suffered other damages including but not limited to grief, depression, and severe emotional distress.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Administrator Raymond Angerstien prays for judgment against the Defendants, jointly and severally, for:

(A)    Compensatory and consequential damages for all the injuries, damages and losses identified in an amount to be determined by the Court and in excess of Twenty-Five Thousand dollars ($25,000.00);

(B)    Punitive damages in an amount to be determined at trial for the willful and malicious conduct of Defendants Laurenti, Troyer, Burket and John and Jane Does 1-5;

(C)    All reasonable funeral and burial expenses;

(D)    Attorneys' fees and the costs of this action and other costs that may be associated with this action; and

(E)  Any and all other relief this Court deems equitable, necessary, and just.

Respectfully Submitted,

The Law Office of Paul J. Cristallo

*/s/ Paul J. Cristallo* .
PAUL J. CRISTALLO (0061820)
The Brownhoist Building
4403 St. Clair Avenue
Cleveland, OH  44103
T:  440-478-5262
F:  216-881-3928
E:  paul@cristallolaw.com
Counsel for Plaintiff Raymond Angerstien,
as Father and Administrator of the Estate of
Ryan Angerstien, Deceased.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

*/s/ Paul J. Cristallo* .
PAUL J. CRISTALLO (0061820)
Counsel for Plaintiff Raymond Angerstien,
as Father and Administrator of the Estate of
Ryan Angerstien, Deceased.